Filed 8/26/22  In re E.B. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.B., a Person Coming Under the Juvenile Court Law. | B317052 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP07513A) |
| Plaintiff and Respondent, | |
| v. | |
| VANESSA S., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Steff Padilla, Judge Pro Tempore.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

————————————

Mother appeals from juvenile court orders denying her petition to modify a court order and terminating her parental rights. On appeal, mother contends the juvenile court erred in finding she did not establish changed circumstances sufficient to reinstate family reunification services and in concluding the parental benefit exception to adoption did not apply in this case. Mother further contends the order terminating her parental rights must be reversed because the Los Angeles County Department of Children and Family Services (DCFS) failed to conduct an adequate inquiry to determine whether E.B. is or may be an Indian child. We find no prejudicial error and affirm the juvenile court orders.

## FACTUAL AND PROCEDURAL BACKGROUND

One-year-old E.B. came to the attention of DCFS in August 2018, when the agency received referrals about mother and father having violent altercations in E.B.'s presence. DCFS learned mother had a history of alcohol and drug abuse. She had completed an inpatient drug program in 2014 and other drug treatment services in 2016. Dependency jurisdiction was previously asserted over mother's older child, in part due to mother's substance abuse. Although mother denied current drug or alcohol use, she subsequently admitted she sometimes had "one beer every now and then," and she and father argued about her drinking. Father and several of his relatives reported mother drank alcohol, acted erratically, and at times appeared to be under the influence. Despite father's expressed concerns about

2

mother's behavior, he left E.B. alone with her.  In November 2018, DCFS detained E.B. from both parents and filed a petition pursuant to Welfare and Institutions Code section 300, subdivisions (b) and (j),[1] alleging mother's past and current substance abuse placed E.B. at risk of harm.  The petition further alleged father failed to protect E.B.  DCFS subsequently filed an amended petition alleging father also had a history of substance abuse and was a current abuser of methamphetamine.

At the January 17, 2019 jurisdiction and disposition hearing, both parents waived their rights to a hearing and pleaded no contest.  The juvenile court sustained an amended petition, asserted dependency jurisdiction over E.B., and removed her from both parents.[2]  The court ordered DCFS to provide reunification services to both parents.  Mother was ordered to participate in drug and alcohol services, random drug and alcohol testing, parenting classes, and individual counseling.  The court ordered mother to have monitored visitation but granted DCFS discretion to liberalize her visits.  DCFS placed E.B. in the home of a paternal cousin.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

[2] The juvenile court dismissed two counts alleging jurisdiction was warranted under section 300, subdivision (j), and amended the petition by interlineation, deleting the allegation that father failed to protect E.B., limiting the allegations related to mother to alcohol use that periodically interfered with her ability to care for E.B., and describing father as a "recent user" of methamphetamine.

3

### *Six-month review hearing*

In advance of the six-month review hearing, DCFS reported mother was consistently participating in services. She regularly submitted to drug and alcohol testing, although in the review period she had several diluted test results and twice missed tests. Although mother denied living with father, it appeared to the social worker that they were either living together or father visited mother's home frequently. DCFS had obtained information that in late March 2019, police were called to mother's home to respond to a domestic violence incident involving father.

Mother was visiting E.B. regularly. During visits mother was engaged with E.B., she got on the floor at eye level and played with E.B., she spoke softly and calmly to her, and E.B. "appear[ed] to have a very good time" during the visits. E.B. had also "bonded well" with the caregiver. She followed the caregiver around the home, responded well when the caregiver spoke to her, and appeared happy and energetic in the home.

At the September 2019 hearing, the juvenile court continued family reunification services.

### *Twelve-month review hearing*

In the report for the 12-month review hearing, DCFS informed the juvenile court that mother was arrested on a driving under the influence charge in May 2019. Since the last hearing, mother had missed five drug tests and was hospitalized in September 2019 for kidney failure due to excessive drinking. However, mother had completed a substance abuse program in October 2019. She had also completed a parenting program.

Father had tested positive for methamphetamines several times, then he stopped submitting to drug tests. Mother denied

that she and father were still in a relationship, yet both parents admitted they had frequent contact and father said he spoke with mother daily. Mother was not participating in individual counseling regularly and had only had two sessions since June 2019.

Mother continued to visit E.B. Mother played with E.B. appropriately, brought food and snacks, provided E.B. positive reinforcement, and focused solely on her during visits.

The review hearing, originally set for March 2020, was delayed until October 2020 as a result of the COVID-19 pandemic. In the meantime, in a September 2020 report, DCFS informed the juvenile court mother had been arrested on another driving under the influence charge in August 2019. Since the March 2020 report, mother had missed several random drug and alcohol tests. She said she was participating in remote Alcoholics Anonymous (AA) meetings, but she provided no proof of attendance to DCFS. However, mother had re-enrolled in individual counseling. She continued to visit E.B., virtually in the early months of the pandemic, then again in person beginning in July 2020.

On October 1, 2020, the day of the review hearing, DCFS submitted a last minute information report informing the juvenile court that mother tested positive for methamphetamine and amphetamine on September 18, 2020.[3] Mother told DCFS she had remained consistent in individual therapy, but the therapist told DCFS that mother had completed only seven sessions since enrolling in March 2020.

---

[3] Because of the pandemic-related delays, the hearing was scheduled as a combined 12- and 18-month review hearing.

Mother testified at the hearing. She indicated she had gained coping skills to avoid resorting to alcohol. She further testified that she had completed a 12-step program and was looking for a sponsor. She admitted testing positive for methamphetamine on September 18, but claimed she had last used the drug in 2015 and denied any recent use. Mother had been attending AA meetings for around a year and a half and had completed 10 therapy sessions with her current therapist. She testified her therapist felt she had grown from the therapy and was discontinuing the sessions. However, mother had not told her therapist that she tested positive for methamphetamine in September.

On cross-examination, mother claimed she had missed drug and alcohol tests due to lack of transportation or because she was working. She denied being hospitalized for kidney failure from excessive drinking—she asserted there were false test results— and she believed the positive methamphetamine test was also an incorrect test.

The juvenile court terminated the parents' reunification services and set a hearing pursuant to section 366.26 (.26 hearing) for February 2021.

### Section 388 and .26 hearings

The .26 report indicated mother continued to visit E.B. The visits were appropriate. DCFS noted, however, that E.B. had lived in the home of the caregiver for almost three years. E.B. saw the caregiver as "her primary mother-figure" and their relationship continued to "bond and grow stronger each day." The caregiver, E.B.'s paternal second cousin, wanted to adopt her. E.B. received "good care, safety and a sense of security" with the caregiver and her family.

6

Shortly before the February 2021 .26 hearing date, mother filed a request to change a juvenile court order pursuant to section 388. Mother declared she had enrolled in another substance abuse program in late October 2020 and completed the program in early December 2020. She was participating in an outpatient program. As of January 2021, she had enrolled in a transitional housing program and was participating in domestic violence, anger management, and parenting programs. She was testing negative for drugs and alcohol. Mother further indicated she and E.B. had a strong bond, she had obtained housing, and she maintained consistent visits with E.B. Mother asked the court to order DCFS to provide additional reunification services and transition E.B. back into her care. The juvenile court set the matter for a hearing.[4] Separately, the court continued the .26 hearing to June 2021.

In a response to mother's section 388 petition, DCFS reported mother had been cited for driving under the influence on May 5, 2021. When interviewed, mother denied driving under the influence. She asserted she had been in a car accident and was cited only for driving without a license. Mother had moved to a different inpatient program; she denied being terminated from the program she was in at the time she filed her section 388 petition. Mother reported she was participating in counseling and maintaining her sobriety. A March 24, 2021 letter from a substance abuse program reported mother enrolled in services in

_____

[4] The juvenile court initially set the matter for hearing on April 5, 2021, to determine whether to grant or deny an evidentiary hearing. On April 5, the court set the matter for an evidentiary hearing on June 10, 2021.

7

late December 2020 and she was continuing to participate in the program. DCFS had also received a March 24, 2021 letter stating mother had been receiving counseling services since mid-February 2021. A social worker was unable to make contact with mother's therapist to confirm mother's participation in counseling.

When a social worker spoke with father, he reported that mother had recently been arrested for driving under the influence after she totaled her car, and that she had been drinking "on and off [the] entire time." DCFS subsequently learned that contrary to mother's reports about her living situation, the transitional housing and aftercare program she had been in asked her to leave after she was arrested for driving under the influence. The program administrator said, "[M]other's recent arrest was a huge downfall and the mother needs to use the tools that she has been taught."

Mother had continued to regularly visit E.B. The caregiver reported the visits were pleasant and took place at the park or McDonalds.

In the section 388 response, DCFS praised mother's efforts to participate in programs but expressed concern that she continued to have an unresolved substance abuse problem and recurrent relapses. DCFS noted that even though mother had completed multiple programs, she had not "substantively benefitted" from the services she had received. Further, "mother's deep rooted underlying issues cannot be mitigated in an additional six months as evidenced by the mother's relapse and criminal actions and convictions." DCFS opined that disruption to E.B.'s environment would be detrimental to her, and interrupting permanency would place her "at risk of yet

8

another traumatic experience that may have a negative impact in her development and mental health."

The section 388 hearing took place over two days, beginning on August 18, 2021. Mother testified she had been in three drug and alcohol programs since the case opened. She was arrested for driving under the influence after completing the last substance abuse program. Mother again testified that she had learned coping skills through her programs and had a sponsor. She expected to complete her current substance abuse program on September 14, 2021.

Mother further testified that she and E.B. still shared a bond and E.B. asked to see her. She had not visited E.B. in over two months after her driving under the influence arrest and entry into an inpatient treatment program.[5] Prior to that time she was visiting E.B. once a week. During visits, mother and E.B. played games, went on the slide at the park, engaged in activities mother brought, and had lunch together. E.B. was almost four years old and had last lived with mother when she was one year old. E.B. called her "Vanessa Mommy." Mother testified E.B. was excited and happy to see her during visits. When visits ended, E.B. would ask the caregiver for "five more minutes, just five more minutes." Mother video chatted or texted with E.B. two or three times a day. E.B. described her school and activities to mother.

---

[5] Mother eventually explained that she was in a treatment program (Shiloh), she was arrested for driving under the influence and went to another program (Stepping Stones), and at the time of the section 388 hearing was in a different program (Mariposa Recovery).

On September 28, 2021, the second day of the section 388 hearing, mother was in a different substance abuse program. A last minute information submitted to the juvenile court included information from the caregiver that mother was terminated from the previous substance abuse program due to "wanting to fight someone." The social worker had not yet been able to make contact with the program to confirm the reasons for mother's departure. Mother denied being terminated from the prior program, insisting the new program was a better opportunity for her as it would also help her with housing. However, mother admitted that prior to her admission into the most recent program she had stayed briefly in a hotel.

The juvenile court concluded mother had not established changed circumstances and denied the section 388 petition. The court pointed out mother's frequent program changes, noting mother had been in three programs that year, which reflected her instability. The court further explained: "Mother has a problem with alcohol. She continues to deny it but it impacts her parenting . . . it's clear that it does."

The juvenile court then proceeded to the .26 hearing. Mother argued the parental benefit exception to adoption applied. The court found the exception did not apply, noting the case had been pending for three years, and during that time E.B. had thrived with the same caregiver. Mother's visits remained monitored and the caregiver was E.B.'s one consistent parental figure. The court further noted that in the preceding year, there were times mother was unable to visit because she was taking care of her own needs. The court therefore rejected the exception and terminated parental rights. Mother timely appealed.

**DISCUSSION**

## I. The juvenile court did not abuse its discretion in denying mother's section 388 petition

Mother contends the juvenile court abused its discretion when it denied her section 388 petition seeking additional reunification services and the return of E.B. to her care. We disagree.

### A. *Applicable legal principles*

"Section 388 permits the parent of a dependent child to petition the juvenile court for a hearing to modify an earlier order on the basis of changed circumstances or new evidence. (§ 388, subd. (a)(1).) The petitioning party bears the burden of showing that there is new evidence or changed circumstances and that the proposed modification would be in the best interests of the child. [Citation.] [¶] In determining whether the petitioning party has carried his or her burden, 'the court may consider the entire factual and procedural history of the case.' [Citation.] . . . [¶] 'Not every change in circumstance can justify modification of a prior order.' [Citation.] The change in circumstances supporting a section 388 petition must be material. [Citations.] In the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*In re N.F.* (2021) 68 Cal.App.5th 112, 120–121.)

After the juvenile court has terminated family reunification services, family reunification is no longer the primary goal of the proceedings. Instead, " 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best

11

interests of the child.  [Citation.]  A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

We review a juvenile court order denying a section 388 petition for abuse of discretion.  (*In re J.C.* (2014) 226 Cal.App.4th 503, 525.)  " 'The appropriate test for abuse of discretion is whether the . . . court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the . . . court.' " (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)

**B.  *Discussion***

The juvenile court did not abuse its discretion in denying mother's section 388 petition.  Dependency jurisdiction in this case was necessary in part due to mother's unresolved alcohol abuse.  Although mother began participating in substance abuse programs at the outset of the case, by September 2021, three years later, mother was still struggling to consistently maintain her sobriety.  After she filed her section 388 petition in February 2021, she was again arrested for driving under the influence in May 2021.  This was an indication that mother continued to abuse alcohol and engage in dangerous behavior while under the influence.  While the section 388 petition was pending, mother was enrolled in at least three different substance abuse programs.  The switching of programs had impaired her ability to maintain regular visits with E.B.

The juvenile court and DCFS commended mother's persistence in seeking substance abuse treatment, despite her

12

relapses. However, the court did not exceed the bounds of reason in concluding that mother had not presented evidence of a substantial change of circumstances as she was far from demonstrating sustained sobriety.

Further, even if mother's evidence established a change of circumstances, the juvenile court did not abuse its discretion in concluding mother had not established the requested change—additional reunification services to facilitate an eventual return of custody—would be in E.B.'s best interests. E.B. had been out of mother's care for three years. Mother's evidence of her relationship with E.B. did not establish that delaying permanence and stability for E.B., in whatever form that might take, would be in E.B.'s best interests. E.B. had been living with the caregiver for most of her life, was attached to her, and saw her as her primary parental figure. Mother's circumstances were unstable and changing, even during the pendency of the section 388 petition. Due to delays, mother received nine months of reunification services *beyond* the applicable 12-month statutory maximum period. (§ 361.5, subd. (a)(1)(B) [for child under three at time of initial removal, services are to be provided for period of no more than 12 months from the date child entered foster care].) In addition, after mother's reunification services were terminated, the evidence established that she continued participating in services for 10 additional months before the section 388 hearing.[6] Yet, return of E.B. to her care was still not

---

[6] The juvenile court detained E.B. on November 26, 2018. The 12-month review hearing should have taken place by January 26, 2020. (§ 366.21, subd. (f)(1)(A); § 361.5, subd. (a)(1)(B); § 361.49.) Instead, and in part due to pandemic-

13

appropriate and mother's request was for an *additional* period of reunification services.  The juvenile court acted well within its discretion in concluding that mother did not establish that granting her request, thereby further delaying permanence and stability, would be in E.B.'s best interests.

## II. The juvenile court did not err in finding the parental benefit exception to adoption did not apply

Mother further contends the juvenile court erred when it rejected her argument that parental rights should not be terminated because she established the parental benefit exception to adoption.  We again disagree.

At the .26 hearing, the juvenile court must select a permanent plan for the child, with the express purpose of providing the child a "stable, permanent" home.  (§ 366.26, subd. (b).)  If the court finds by clear and convincing evidence that the child is likely to be adopted, the court must terminate parental rights to allow for adoption, unless the parent shows termination would be detrimental to the child for one of several reasons set forth in section 366.26, subdivision (c).  (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  The " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' "  (*Id.* at p. 631.)

Under section 366.26, subdivision (c)(1)(B)(i), the parental benefit exception applies when the juvenile court finds

---

related delays, the hearing took place on October 1, 2020.  The section 388 hearing did not take place until August 18, 2021, and did not conclude until September 28, 2021.  By the time of the section 388 hearing, mother had participated in over 30 months of programs and services.

termination of parental rights would be detrimental to the child because the parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. In *Caden C., supra*, 11 Cal.5th at p. 636, our high court explained that a "parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new adoptive home."

We review the first two elements for substantial evidence; the third is reviewed for abuse of discretion. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) When reviewing for substantial evidence we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The [juvenile court's factual] determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the . . . court might have reached a different result had it believed other evidence.' " (*Id.* at p. 640.) As explained above, we will find an abuse of discretion "only when ' " 'the . . . court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

Mother asserts the juvenile court failed to properly address the parental benefit exception because it did not explicitly

15

reference each of the three elements individually. We find no such error. The juvenile court explicitly referenced *Caden C.* in its ruling and expressed an understanding of the relevant law. The court was not required to make specific findings on the record as to each element of the exception. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 [no authority for proposition that specific findings required and inferring from § 366.26, subd. (c)(1)(D) that specific findings *not* required when court concludes terminating parental rights would not be detrimental].)

Mother testified that she had not visited E.B. in over two months, although she had maintained contact through other means.[7] The juvenile court also noted mother had not maintained regular visitation in the year preceding the .26 hearing. To the extent the court found mother failed to establish the parental benefit exception's first element of regular visitation, we would conclude substantial evidence supported that finding. (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1069 [any ambiguity in court finding as to regularity of visitation must be construed *against* parent].)

However, the juvenile court's analysis appeared to focus on the third element, whether terminating the relationship between mother and E.B. would be detrimental even when balanced against the benefit of a new adoptive home. We find no abuse of discretion in the court's finding that it would not be detrimental.

The juvenile court described several factors it considered: the significant length of time E.B. had been out of mother's care;

---

[7] At the .26 hearing, the juvenile court granted mother's request that it incorporate and consider mother's testimony from the section 388 hearing.

16

that mother's visits had remained monitored, which prevented her from taking on more of a meaningful role in E.B.'s life; and E.B.'s need for permanence and stability. These were all highly relevant to the question of whether E.B.'s loss of the relationship with mother would "harm [her] to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) The court could reasonably conclude the benefits of placement in an adoptive home outweighed the harm of losing the relationship with mother. E.B. was detained from mother when she was one year old. She was almost four years old by the .26 hearing. Although there was evidence of a pleasant, warm relationship between E.B. and mother, there was no evidence E.B. suffered any distress or negative effects during the periods mother was unable to visit. (*In re A.L.*, *supra*, 73 Cal.App.5th at pp. 1158–1159 [evidence that while father's visits were consistent and positive, child had no difficulty separating and was unaffected by missed visits, supported finding that potential benefit of adoption outweighed harm].) E.B. had thrived in the caregiver's home and viewed the caregiver as her primary mother figure.

Mother's contention that the juvenile court failed to consider the parental benefit exception consistent with *Caden C.* is not supported by the record.[8] The record indicates the juvenile

---

[8] We do not understand the juvenile court's references to mother's relapses as an indication the court impermissibly concluded her continued struggle with alcohol abuse was a bar to the application of the parental benefit exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) In context, the court's comments directly related to appropriate considerations: the amount of time E.B. had spent living with the caregiver and mother's

17

court considered the exception and found it inapplicable after appropriately considering and weighing the harms and benefits of terminating mother's parental rights. The court's conclusion was not arbitrary, capricious, or patently absurd.

## III. Reversal is not warranted due to ICWA inquiry error
### A. *Background*

DCFS filed the juvenile dependency petition in this case on November 21, 2018. An ICWA-010(A) Indian Child Inquiry Attachment form accompanied the petition. The form indicated mother was questioned about Indian ancestry and reported "[t]he child has no known Indian ancestry." At the November 26, 2018 detention hearing, both parents completed and submitted Parental Notification of Indian Status (ICWA-020) forms, each declaring they had no Indian ancestry as far as they knew. Mother's form stated a previous ICWA-020 form had been filed with the court.[9] At the hearing, the court twice stated on the record, "No ICWA." The minute order from the hearing reported the filing of the ICWA-020 forms and set forth the detailed finding that the court did not have a reason to know E.B. was an Indian child and did not order notice to any tribe or the Bureau of Indian Affairs. Both parents were ordered "to keep [DCFS], their

---

inability, at times, to maintain consistent visitation. Moreover, we do not presume error and any ambiguities are resolved in favor of sustaining the juvenile court orders. (*In re Eli B.*, *supra*, 73 Cal.App.5th at p. 1069.)

[9] This may have been a reference to the prior dependency matter involving mother's older child.

18

Attorney, and the Court aware of any new information relating to possible ICWA status."

On December 6, 2018, a DCFS social worker again asked both parents about Indian ancestry. Both parents denied having "any Native American heritage." The record does not reflect that DCFS conducted any further inquiry with respect to ICWA.

**B.** *Analysis*

As we understand her arguments, mother contends DCFS failed to comply with section 224.2, subdivision (b), because no inquiry was made of extended relatives to determine whether E.B. is or may be an Indian child. DCFS contends any error was not prejudicial. Applying the standard set forth by our colleagues in Division Two of this court in *In re Dezi C.* (2022) 79 Cal.App.5th 769 (*Dezi C.*), we find mother has not established that any error was prejudicial and warrants reversal.

"ICWA was enacted ' "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . ." [Citation.]' (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8 . . . ; see 25 U.S.C. § 1902.)" (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1078.)

Section 224.2 sets forth the duties of a county welfare department and the juvenile court in determining whether a child is or may be an Indian child. An " 'Indian child' " is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (a).)

Section 224.2, subdivision (a), provides that both the juvenile court and the child welfare agency have an "affirmative and continuing duty" to inquire whether a child is or may be an Indian child, beginning with the "initial contact," which includes asking the party reporting abuse or neglect if they have any information that the child may be an Indian child.

Under section 224.2, subdivision (b), if a child is placed in DCFS's temporary custody, the agency must inquire whether the child is or may be an Indian child, by asking a nonexclusive group that includes the child, the parents, and extended family members. Under section 224.2, subdivision (c), at the first court appearance of each party, the juvenile court must ask whether the appearing party knows or has reason to know that the child is an Indian child. In addition, the court must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child.[10]

Under section 224.2, subdivision (e), if the juvenile court or social worker has reason to believe an Indian child is involved in the proceeding, but does not have enough information to determine there is a reason to know the child is an Indian child, the court or the social worker must make further inquiry, as soon as practicable. "[R]eason to believe" means the court or social

_____

[10] Subdivision (b) of section 224.2 was added to the statute after DCFS's initial contact with the family and the detention hearing in this case. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048–1051.) However, the jurisdiction and disposition hearing occurred in 2019, after amendments to section 224.2 went into effect, and the juvenile court and DCFS had a continuing duty to inquire whether E.B. is or may be an Indian child. (§ 224.2, subd. (a).)

worker has information "suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).) "Further inquiry" includes actions such as "[i]nterviewing the parents, Indian custodian, and extended family members" to gather information that would be necessary to provide notice to any relevant tribes. (§§ 224.2, subd. (e)(2)(A), 224.3, subd. (a)(5).) It also includes contacting the Bureau of Indian Affairs and State Department of Social Services for assistance in identifying contact information of relevant tribes, and contacting the "tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2)(B)-(C).)

There is "reason to know" a child is an Indian child when: a person having an interest in the child informs the juvenile court the child is an Indian child; the residence of the child, the child's parents, or the child's Indian custodian, is on a reservation or in an Alaskan Native village; a participant in the proceeding, officer of the court, Indian tribe or organization, or agency informs the court it has discovered information indicating the child is an Indian child; the child gives the court reason to know that the child is an Indian child; the court is informed that the child is or has been a ward of a tribal court; or the court is informed either the parent or the child possesses an identification card indicating membership or citizenship in an Indian tribe. (§ 224.2, subd. (d).)

Section 224.2, subdivision (i)(2), provides that if "the court makes a finding that proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] . . . does not apply to

21

the proceedings, subject to reversal based on sufficiency of the evidence." "On appeal, we review the juvenile court's ICWA findings for substantial evidence." (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051; *In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

Here, mother contends DCFS and the juvenile court failed to comply with the duty of inquiry, without any additional specific argument. As we understand mother's argument from her recitation of the facts, she appears to contend the error was in DCFS's failure to ask extended relatives whether E.B. is or may be an Indian child, consistent with section 224.2, subdivision (b).[11]

Section 224.1, subdivision (c), adopts the federal definition of " 'extended family member' ": " '[E]xtended family member' shall be as defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

There is no indication that DCFS asked any of the relatives with whom it had contact whether E.B. is or may be an Indian

---

[11] Mother notes in her appellate briefing that the juvenile court did not "inquire on the record" at the .26 hearing, but simply stated, "No ICWA." DCFS appears to construe this factual recitation as a separate assertion of inquiry error; we do not. Arguments on appeal must be supported by discussion and citations to legal authority, otherwise we may deem them forfeited. (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075.)

child.[12]  We therefore agree that DCFS failed to comply with section 224.2, subdivision (b) and the juvenile court lacked sufficient evidence to conclude DCFS exercised the due diligence required for a finding under section 224.2, subdivision (i)(2). However, as explained in *Dezi C.*, *supra*, 79 Cal.App.5th 769, any error in compliance with section 224.2, subdivision (b), is state law error.  Reversal is warranted only if the error is prejudicial. We must determine whether it is reasonably probable that the juvenile court would have made the same ICWA finding had DCFS fully complied with its duty of inquiry.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Dezi C.*, at p. 777.)

We agree with the *Dezi C.* court that the proper application of our state's test for harmless error in this context is that "an agency's failure to conduct a proper initial inquiry into a dependent child's American Indian heritage is harmless unless the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding.  For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal."  (*Id.* at p. 779.)

---

[12] Mother identifies "paternal cousins and maternal great-grandmother" as relatives with whom DCFS had contact. Although DCFS did learn from the caregiver, E.B.'s paternal cousin, that she is a "Filipina" and was "raised . . . in a . . . traditional Filipino household," and other documents identified father as "Filipino," the record does not indicate DCFS asked the cousin or other relatives about any American Indian ancestry in the respective families.

This approach "effectuates the rights of the tribes in those instances in which those rights are most likely at risk, which are precisely the cases in which the tribe's potential rights do justify placing the children in a further period of limbo. The 'reason to believe' rule also removes the incentive to use ICWA as a thirteenth-hour delay tactic and, by allowing parents to cite their proffers on appeal as well as the juvenile court record, still sends a 'message' to agencies that ICWA's mandates are not to be ignored because remand will be ordered in any case where there is reason to believe the failure to inquire mattered." [13] (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 782.)

_____

[13] We reject the automatic reversal rule adopted by some courts. (See, e.g., *In re H.V.* (2022) 75 Cal.App.5th 433, 438; *In re Y.W.* (2021) 70 Cal.App.5th 542, 556.) We agree with the courts and others who have concluded the automatic reversal approach fails to acknowledge or reconcile the requirements of ICWA and section 224.2 with the California Constitution's mandate that a judgment may not be set aside unless it has resulted in a miscarriage of justice. (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779; *In re A.C.* (2022) 75 Cal.App.5th 1009, 1020 (conc. & dis. opn. of Crandall, J.).) The automatic reversal approach also requires the court to conclude parents' reports of their own Indian heritage cannot be trusted, irrespective of whether there are circumstances warranting such distrust. (*Dezi C.*, at p. 784; *In re Ezequiel G.* (July 29, 2022, B314432) ___ Cal.App.5th ___ [2022 Cal.App. Lexis 671, *33] [because tribal membership typically requires affirmative act by parent, parent often will be reliable source of information]; see *In re M.M.* (2022) 81 Cal.App.5th 61, 71 ["There are serious costs if courts delay finalizing permanency for a child in every case where extended family was not questioned, on the remote chance those relatives might have information which is inconsistent with the parents' disclaimer of

Here, the record contains no information suggesting there is reason to believe E.B. is or may be an Indian child, such that the absence of inquiry of other relatives was prejudicial to the juvenile court's ICWA finding. Both parents repeatedly denied any Indian ancestry. The record did not indicate that either parent was adopted or raised without a connection to their biological parents or other family members. No other factor suggested that the parents' knowledge of Indian ancestry might not be "fully informed." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 779; cf. *In re Y.W.*, *supra*, 70 Cal.App.5th at p. 548 [mother was adopted and had no information about biological relatives]; *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 740 [father never appeared, and mother had no reason to know father's ancestry].) Mother has made no proffer on appeal or representation that additional inquiry may have led to the revelation of even potential Indian ancestry.

Under these circumstances, we find any error in DCFS's failure to interview extended relatives does not warrant reversal.

---

Indian ancestry"]; *In re H.V.*, at pp. 439–442 (dis. opn. of Baker, Acting P. J.).)

**DISPOSITION**

The juvenile court orders are affirmed.

NOT TO BE PUBLISHED.


ADAMS, J.*


I concur:


EGERTON, J.

---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

LAVIN, J., Concurring and Dissenting:

I agree that the juvenile court did not abuse its discretion by denying mother's petition under Welfare and Institutions Code section 388. I also agree that the court did not err in finding the parental benefit exception to adoption did not apply. For the reasons set forth in my dissent in *In re Ezequiel G.* (July 29, 2022, B314432) ___Cal.App.5th___ [2022 WL 3009914], however, I would conditionally affirm the order terminating mother's parental rights and remand for further proceedings.


LAVIN, Acting P. J.